UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:

ELIZABETH MARIE STROM,

    Debtor.                                                                                        Case No. 7-10-14024-TA

PHILIP J. MONTOYA, Trustee,

    Plaintiff,

v.                                                                                                               Adv. No. 10-1186 T

MARIEBETH B. VELASQUEZ,

    Defendant.

## MEMORANDUM OPINION

This opinion addresses whether two alleged transfers from the Debtor to the Defendant can be recovered by the Chapter 7 trustee (the "Trustee"), either as fraudulent transfers, under a state law conversion theory, or by compelling their turnover pursuant to 11 U.S.C. § 542. The Court conducted a trial on the merits on December 18, 2012 and took the matter under advisement. Based on the trial evidence and applicable law, the Court rules in Defendant's favor on all counts.[1]

### I.     FINDINGS OF FACT

#### General History

1.     Debtor met Defendant in August, 2007, and they began a relationship shortly thereafter.

2.     Defendant moved into Debtor's home in early 2008.

---

[1] This is a core matter. The parties consented to the jurisdiction of the Court and for the Court to hear and determine this proceeding and enter final orders and judgments under 28 U.S.C. § 157.

3. Debtor paid the majority of the household expenses until Defendant graduated from medical school in mid-2009.

4. Debtor commenced the above-captioned Chapter 7 bankruptcy case on August 9, 2010.

The April Transfer

5. In April, 2008 Debtor took out a $30,000 second mortgage on her house.

6. Between April 10 and April 14, 2008, Debtor used the loan proceeds from the second mortgage to transfer $30,470.13 to or for the benefit of Defendant (the "April Transfer"). The funds were used to pay off Defendant's credit card debt.

7. Debtor did not ask Defendant to repay the April Transfer, and Defendant did not agree to do so.

8. Debtor did not make the April Transfer with the intent to hinder, delay, or defraud creditors.

9. Debtor did not receive any value in exchange for the April Transfer.

Debtor's Financial Condition in April, 2008

10. Debtor paid $246,000 for her house in June, 2007. When Debtor obtained her $30,000 second mortgage in April, 2008, the appraised value of the house was $290,000. Debtor testified that, in her opinion, her house was worth about $225,000 in April, 2008 because a nearby house had been listed and/or sold for that amount. Given all of the information, $225,000 is a reasonable estimate of the house's value as of April 11, 2008.

11. Debtor had a savings account with a balance of about $60,335 on April 11, 2008.

12. Debtor had a checking account with a balance of about $32,419 on April 11, 2008 (this balance includes the $30,000 second mortgage loan proceeds).

13. Debtor listed her tangible personal property on her bankruptcy schedules at a total value of $26,886.

14. Debtor listed her first mortgage balance on her bankruptcy schedules at $141,716.

15. On April 11, 2008, Debtor owed $30,000 on her second mortgage.

16. Debtor testified that she had other debts of about $2,000 when she bought her house in June, 2007. She could not give a figure for the amount of her other debts on April, 2008.

17. Debtor claimed the following exemptions on her bankruptcy schedules:

    a. Homestead      $30,000

    b. 401k/retirement      $16,300

    c. Auto      $2,500

    d. Household goods      $6,875

    e. Jewelry      $100

    f. Life Insurance      $300

    g. Wearing Apparel      $400

    h. Cash and checking      $411

The August Deposit

18. Defendant had been a member of New Mexico Educators Federal Credit Union since September 22, 2000, and had a combined savings and checking account there (account # 22825512).

19. On June 13, 2008, Debtor was added as an additional signatory and joint owner of the account (hereafter, the "Joint Account").

20. The general idea was that Debtor and Defendant would pool their resources and income into the Joint Account and use the Joint Account to pay their expenses.

21. Debtor and Defendant both had the right to make deposits into, and to cause debits and withdrawals from, the Joint Account, up to the full account balance, and also to transfer funds between subaccounts.[2]

22. On August 8, 2008, Debtor transferred $60,506.06 (the "Deposited Funds") to the Joint Account (the "August Deposit") from Debtor's separate Bank of America account.

23. Debtor did not make the August Deposit with the intent to hinder, delay, or defraud creditors.

24. Immediately after the August Deposit, the Joint Account held about $2,731 of Defendant's funds and the Deposited Funds.

25. Debtor and Defendant both made deposits into the Joint Account, and both caused debits and other withdrawals from the Joint Account.

---

[2] After Debtor was added to the Joint Account, the account was modified to include a "non transaction share" subaccount, a "checking with dividend" subaccount, a "second shares" subaccount, and a "money market" subaccount.

-4-

26. Between June 13, 2008 and June 30, 2009, Defendant and Debtor both deposited the majority of funds they received from student loans, wages, unemployment, etc. into the Joint Account.

27. The balance of the Joint Account was gradually reduced from about $63,237 on August 8, 2008 to about $3,171.53 on June 30, 2009.

28. Debtor and Defendant lived together until about June, 2010, when Defendant moved out of Debtor's house and their relationship ended.

29. Defendant spent a substantial portion of the funds in the Joint Account, but the activities and expenses often benefitted both the Defendant and the Debtor. For example:

    (a) Debtor and/or Defendant bought a television from Baillos for $2,173.26, which they both used at Debtor's house;

    (b) Debtor spent over $2,000 at Sandia Casino on Defendant's medical school graduation party;

    (c) Debtor spent $2,049 for a laptop computer, a present to Defendant; and

    (d) Debtor and Defendant traveled to Oregon, California, Nevada, and Florida together, usually with Debtor's daughter.

<u>Other</u>

30. Debtor lost her job in about November, 2008. Thereafter, she and Defendant lived on Defendant's student loan proceeds and the Joint Account balance

-5-

until Defendant graduated from medical school and began working as a medical resident.³

31.　After Defendant moved out, she paid Debtor's first mortgage through September, 2010, and paid the second mortgage until June, 2011.

32.　Debtor and Defendant received the monthly bank statements at their home address. It is not clear the extent to which Debtor reviewed the statements, but the information was available to Debtor.⁴

## II.　DISCUSSION

A.　<u>The Trustee's New Mexico Fraudulent Transfer Act Claim</u>.

The Trustee sued Defendant to recover the April Transfer as a fraudulent transfer under N.M.S.A. § 56-10-1 et seq. (1989) (the "New Mexico UFTA").⁵ The Trustee does not specify in the Pre-Trial Order whether he is proceeding under N.M.S.A. §56-10-18, §56-10-19, or both. However, at trial the Trustee's counsel stated that the claim was based on allegations that Debtor received no reasonably equivalent value in exchange for the April Transfer, and was rendered insolvent by the transfer. The Court will therefore analyze the claim under § 56-10-19(A), which provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

---

³ Debtor also continued to receive child support, which was used to support Debtor's daughter.
⁴ The account information was available online as well as through the monthly account statements. Defendant reviewed the statements online.
⁵ The Trustee did not bring the claim under the 11 U.S.C. § 548, presumably because the transfer occurred more than two years before the petition date. The New Mexico UFTA has a four-year "look-back" period, compared to the two-year look-back period in 11 U.S.C. § 548(a). *See* N.M.S.A. § 56-10-23.

-6-

Case 10-01186-t    Doc 69    Filed 01/10/13    Entered 01/10/13 14:39:22 Page 6 of 19

The Court agrees that the April Transfer constituted a "transfer" within the meaning of the New Mexico UFTA,[6] and that Debtor did not receive reasonably equivalent value for the transfer. The only remaining issue is solvency. Pursuant to the New Mexico UFTA, "[a] debtor is insolvent if the sum of the debtor's debt is greater than all of the debtor's assets at a fair valuation." N.M.S.A. § 56-10-16(A).[7] This is known as the "balance sheet" insolvency test.

After carefully reviewing all of the evidence presented at trial, the Court concludes that the Trustee failed to prove that Debtor was insolvent on the date of the April Transfer. The evidence regarding Debtor's financial condition in April, 2008 is incomplete. Debtor could not provide an estimate of her liabilities at that time, and the Trustee did not proffer evidence on this issue.[8] In addition, the value of Debtor's personal property in April, 2008 is unclear.[9] The Court would be justified in ruling against the Trustee for failing to introduce evidence upon which to determine the Debtor's April, 2008 financial condition. Nevertheless, the Court constructed a balance sheet using all the available trial exhibits and testimony, and, where appropriate, giving the Trustee the benefit of the doubt as to the exact calculations. The Court finds that based on the available evidence, the April Transfer did not render Debtor insolvent.

---

[6] *See* N.M.S.A. § 56-10-20(A)(2) ("[A] transfer is made … when the transfer is so far perfected that a creditor on a simple contract cannot acquire a judicial lien otherwise than under the Uniform Fraudulent Transfer Act that is superior to the interests of the transferee.").

[7] Section 56-10-16(B) also provides that "[a] debtor who is generally not paying his debts as they become due is presumed to be insolvent." There is no evidence that Debtor was generally not paying her debts as they became due during the relevant time period. The presumption of insolvency set forth in N.M.S.A. § 56-10-16(B) therefore does not apply here.

[8] Debtor testified that her liabilities, which were roughly $2,000 in 2007, were "up there" in April, 2008.

[9] Debtor's testimony as to whether the values listed on her bankruptcy schedules were roughly same as the values in April, 2008 is unclear.

-7-

In constructing the balance sheet, the Court followed the general rule that the debtor's exempt property should be excluded from the asset side of the balance sheet in determining "fair valuation." *See Benson v. Richardson*, 537 N.W.2d 748, 757 (Iowa 1995), *citing First Nat'l Bank v. Frescoln Farms, Ltd.*, 430 N.W.2d 432, 436-37 (Iowa 1988).[10] In addition, the Court did not deduct anticipated costs of sale; the law is reasonably clear that such costs are not to be deducted when determining "fair valuation." *See Hunter Press, Inc. v. Connecticut Bank & Trust Co.*, 420 F. Supp. 338, 341 (D. Conn. 1976); *In re Golden Mane Acquisitions, Inc.*, 221 B.R. 963, 968 (Bankr. N.D. Ala. 1997); *In re Nellis*, 12 B.R. 770, 773 (Bankr. D. Conn. 1981); *In re Pioneer Home Builders, Inc.*, 147 B.R. 889, 892 (Bankr. W.D. Tex. 1992); *Household Finance Corp. III v. Wilk*, 1992 WL 165770 (W.D.N.Y. 1992). *See also In re Yackel*, 114 B.R. 349, 351 (Bankr. N.D.N.Y. 1990) (discussing the issue in the context of a lien avoidance determination).[11]

Before the April Transfer, Debtor's balance sheet was approximately:

| Assets | Value |
| --- | --- |
| House | $225,000 |
| Savings | $60,335 |
| Checking | $32,419 |
| Personal Property | $26,886 |
| Total | $344,640 |
| Liabilities | |
| First Mortgage | $141,716 |
| Second Mortgage | $30,000 |
| Other debt | $2,000 |
| Total debt | $173,716 |
| Net Worth | $170,924 |

---

[10] *See also In re Waddell*, 2000 WL 33963917, *2 (Bankr. S.D. Fla. 2000); *In re Krantz*, 97 B.R. 514, 523 (Bankr. N.D. Iowa 1989); *In re Meyer*, 206 B.R. 410, 417 (Bankr. E.D. Va. 1997), *vacated on other grounds*, 244 F.3d 352 (4th Cir. 2001); *Premier Capital, Inc. v. Hand*, 2007 WL 4865777 (R.I. Super. Ct. 2007).

[11] While these cases construe the Bankruptcy Code definition of "insolvent" rather than New Mexico's UFTA definition, it seems reasonable to use the same rule because both statutes use the term "fair valuation."

Case 10-01186-t    Doc 69    Filed 01/10/13    Entered 01/10/13 14:39:22 Page 8 of 19

| Value of Exempt Property | |
|---|---|
| Homestead | $30,000 |
| 401k/retirement | $16,300 |
| Auto | $2,500 |
| Household goods | $6,875 |
| Jewelry | $100 |
| Life Insurance | $300 |
| Wearing Apparel | $400 |
| Cash and checking | $311 |
| Total | $56,786 |
| Net Worth After Deducting Exempt Property | **$114,138** |

After the April Transfer, Debtor's balance sheet was approximately:

| Assets | Value |
|---|---|
| House | $225,000 |
| Savings | $60,335 |
| Checking | $1,948 |
| Personal Property | $26,886 |
| Total | $314,169 |
| Liabilities | |
| First Mortgage | $141,716 |
| Second Mortgage | $30,000 |
| Other debt | $2,000 |
| Total | $173,716 |
| Net Worth | $140,453 |
| Value of Exempt Property | |
| Homestead | $30,000 |
| 401k/retirement | $16,300 |
| Auto | $2,500 |
| Household goods | $6,875 |
| Jewelry | $100 |
| Life Insurance | $300 |
| Wearing Apparel | $400 |
| Cash and checking | $311 |
| Total Exempt property | $56,786 |
| Net Worth After Deducting Exempt Property | **$83,667** |

Excluding Debtor's exempt property and assigning values to Debtor's debts and assets based on the evidence introduced at trial, the Court finds that Debtor was solvent

Case 10-01186-t    Doc 69    Filed 01/10/13    Entered 01/10/13 14:39:22 Page 9 of 19

after the April Transfer. She initially had a net worth of $114,138, and the April Transfer reduced her net worth to $83,667. The April Transfer did not render Debtor insolvent, and the Trustee's fraudulent transfer claim under the New Mexico UFTA therefore fails.[12]

B. The Trustee's 11 U.S.C. § 548 Claim.

Next, the Trustee claims that the Deposited Funds are recoverable under 11 U.S.C. § 548.[13] As with the New Mexico UFTA claim, the Trustee does not specify which portion of § 548 he relies upon. However, at trial the Trustee made clear that his claim to recover the Deposited Funds was based on the same theory as recovery of the April Transfer, i.e. lack of reasonably equivalent value in exchange for the transfer and insolvency. Thus, the Court will analyze the claim under 11 U.S.C. § 548(a)(1)(B).

1. Was the August Deposit a Transfer?

A threshold issue is whether the August Deposit constituted a transfer to Defendant. Under 11 U.S.C. § 548(d)(1), a transfer is completed:

---

[12] The Trustee's claim also fails under N.M.S.A. § 56-10-18(A)(1) and (2), if the Trustee intended to proceed under these sections. The § (A)(1) claim fails because Debtor did not make the April Transfer with intent to hinder, delay, or defraud creditors. The § (A)(2) claim fails because the Trustee did not introduce any evidence that Debtor's remaining assets were "unreasonably small" for a business or transaction, or that Debtor intended to incur debts beyond her ability to pay them as they became due.

[13] The Trustee brought his claim to recover the August Deposit under 11 U.S.C. § 548, rather than the New Mexico UFTA. Since Debtor's bankruptcy case was filed two years and one day after the August Deposit, Trustee's § 548 claim may be time-barred. *See* 11 U.S.C. § 548(a)(1). However, Defendant did not plead this as a defense, and it was not argued at trial. The Court therefore concludes that Defendant waived the defense. *See* Fed.R.Civ.P. 8(c), made applicable to bankruptcy proceedings by Fed.R.Bankr.P. 7008. Furthermore, at the beginning of trial the Trustee's counsel acknowledged that the Trustee may not be able to proceed under § 548 because of the two-year look-back provision, and indicated that the Trustee instead sought recovery under the New Mexico UFTA. Defendant's counsel did not object, and the matter was tried on that basis. To the extent there is a limitations problem under 11 U.S.C. § 548, the Court will treat the claim as one brought under § 19 of the New Mexico UFTA. The result is the same under either statute.

-10-

> when such transfer is so perfected that a bona fide purchaser from the
> debtor against whom applicable law permits such transfer to be perfected
> cannot acquire an interest in the property transferred that is superior to the
> interest in such property of the transferee ….

This language means that the alleged transfer would only have occurred when Debtor could no longer assign her rights in the August Funds to a third party, superior to Defendant's claim to the funds. *See In re Smith*, 614 F.3d 654, 658 (7th Cir. 2010) (Section 548(d)(1) means a transfer is complete when, under governing state law, the transferee's interest is perfected relative to a potential bona fide purchaser); *In re Christian*, 48 B.R. 833, 836 (D. Colo. 1985) (same); *In re Leach*, 380 B.R. 25, 28 (Bankr. D.N.M. 2007) (same).[14]

Pursuant to the New Mexico Uniform Probate Code ("UPC"), funds in joint bank accounts belong to the parties in proportion to their net contributions. N.M.S.A. § 45-6-211 provides:

> A. As used in this section, "net contribution" of a party means the sum of all deposits to an account made by or for the party, less all payments from the account made to or for the party which have not been paid to or applied to the use of another party and a proportionate share of any charges deducted from the account, plus a proportionate share of any interest or dividends earned, whether or not included in the current balance. . . .
>
> B. During the lifetime of all parties, an account belongs to the parties in proportion to the net contribution of each to the sums on deposit, unless there is clear and convincing evidence of a different intent. . . .

The New Mexico UPC is identical to § 6-103 of the Uniform Probate Code. The drafting committee's comment to § 6-103 states:

---

[14] The New Mexico UFTA contains equivalent language. *See* N.M.S.A. § 56-10-20(A)(2). Although it defines transfer in terms of whether a creditor could obtain a judicial lien, rather than whether a bona fide purchase could get clear title, the difference is immaterial in this case.

-11-

> This section reflects the assumption that a person who deposits funds in a multiple-party account normally does not intend to make an irrevocable gift of all or any part of the funds represented by the deposit. Rather, he usually intends no present change of beneficial ownership.

Unif. Probate Code § 6-103 cmt., 8 U.L.A. 524-525 (1983). *See also Johnston v. Sunwest Bank of Grant County*, 116 N.M. 422, 424, 863 P.2d 1043, 1045 (1993) (noting that the party who deposits a particular sum of money into a joint account retains ownership over those funds); *Hughes v. Hughes*, 96 N.M. 719, 721-22, 634 P.2d 1271, 1273-74 (1981) ("Generally, the mere opening of a joint account is not sufficient to establish a gift or trust").[15]

Under the New Mexico UPC, the Deposited Funds belonged to Debtor even after she put them in the Joint Account. To prove otherwise, the Trustee was required to introduce clear and convincing evidence that Debtor intended to transfer ownership of the Deposited Funds to Defendant.[16] No such evidence was introduced at trial. On the contrary, Debtor's testimony was that she expected the funds to be spent responsibly by Debtor and Defendant on joint living expenses, when and as needed.[17] Debtor further testified that, had she known about Defendant's spending habits sooner, she would have

---

[15] *See generally Baker v. Baker*, 710 P.2d 129,134-35 (Okla. App. 1985) (judgment creditor may garnish joint bank account, but only to the extent of judgment debtor's ownership interest in that account); 86 A.L.R. 5th 527, *Joint Bank Account as Subject to Attachment, Garnishment, or Execution by Creditor of One Joint Depositor* (2001) (stating as a general proposition that a creditor may only attach or garnish a joint account to the extent of the debtor's equitable interest in the account, and collecting cases).

[16] N.M.S.A. § 45-6-211(B).

[17] Debtor testified she was unaware Defendant was spending the Joint Account funds on travel, dining, gambling, and the like. The Court finds more credible Defendant's testimony that Debtor was generally aware of the expenses, as well as the fact that Debtor and Defendant were spending substantially more money every month than they were making. Other evidence substantiates Defendant's version of events, such as the fact that she and Debtor continued to live together for about a year after the Joint Account has been depleted.

-12-

stopped Defendant from spending so much money. This testimony is inconsistent with an intent to transfer ownership to Debtor in August, 2008.

Given the lack of clear and convincing evidence to the contrary, the Court finds that Debtor retained ownership of the Deposited Funds, such that they were not transferred to Defendant on August 8, 2008.

2. Was Debtor Rendered Insolvent?

Even if the Deposited Funds had been transferred to Defendant in August, 2008, Debtor would not have been rendered insolvent by the transfer.[18] In such an event, on August 9, 2008 Debtor's balance sheet would have resembled:

| Assets | Value |
|---|---|
| House | $225,000 |
| Savings | $0 |
| Checking | $1,948 |
| Personal Property | $26,886 |
| Total | $253,834 |
| Liabilities | |
| First Mortgage | $141,716 |
| Second Mortgage | $30,000 |
| Other debt | $2,000 |
| Total | $173,716 |
| Net Worth | $80,118 |
| Value of Exempt Property | |
| Homestead | $30,000 |
| 401k/retirement | $16,300 |
| Auto | $2,500 |
| Household goods | $6,875 |
| Jewelry | $100 |
| Life Insurance | $300 |
| Wearing Apparel | $400 |

---

[18] Since the Trustee did not introduce any evidence of the value of Debtor's assets in August, 2008, the Court must either use the same values as in April, 2008, or rule against the Trustee based on a lack of evidence. The Court has attempted, based on the trial evidence, to construct the balance sheet as of August, 2008 in order to reach the merits of the claim. The Court rules in the alternative, however, that the Trustee did not carry his burden of proof on the insolvency issue.

-13-

| Cash and checking | $311 |
| Total | $56,786 |
| Net Worth After Deducting Exempt Property | **$23,332** |

Given continued balance sheet solvency, the Trustee's § 548 claim fails.

        3.        <u>Were Subsequent Expenditures of the Deposited Funds Fraudulent Transfers</u>?

Although the pleadings are ambiguous, the Trustee seems to suggest that the relevant transfers occurred when Defendant spent the Deposited Funds, rather than on August 8, 2008. The Court concludes that the Trustee cannot prevail under this theory. First, much of Defendant's spending benefited Debtor in whole or in part, such that Debtor received reasonably equivalent value. Second, Defendant made deposits into the Joint Account even as she spent the Deposited Funds, giving additional value to Debtor.[19] Third, Debtor would not have been rendered insolvent if the Deposited Funds had been transferred to Defendant on August 8, 2012. To have the same funds gradually transferred over the following 10 months likely did not change this result. It is possible Debtor's financial situation deteriorated so rapidly over this period of time that insolvency resulted at some point. However, the Trustee provided no evidence to that effect, so no such finding can be made.

        C.        <u>The Trustee's Conversion Claim.</u>

The Trustee also asserts that "[f]rom August, 2008 through June, 2009, Defendant spent the $60,000 in the [Joint Account] without the Debtor's authorization." Pre-Trial Order, entered November 29, 2012, doc. 64 (the "Pre-Trial Order"), § 2(a). Based on

---

[19] Granted, it seems clear that Defendant spent more than she deposited, but there is not a sufficient record upon which to determine whether Defendant's net spending benefited her alone.

-14-

the allegations and evidence, it appears the Trustee attempted to bring a conversion or similar claim against Defendant to recover the Deposited Funds. Though the Pre-Trial Order is ambiguous,[20] the Court will construe it liberally to reach the merits of the Trustee's conversion claim. *See Skinner v. Switzer*, ⎯⎯ U.S. ⎯⎯, 131 S. Ct. 1289, 1296 (2011) ("[U]nder the Federal Rules of Civil Procedure, a complaint need not pin [a] plaintiff's claim for relief to a precise legal theory"); *Blair v. City of Worcester*, 522 F.3d 105, 110 (1st Cir. 2008) (also noting that a complaint does not have to articulate precise legal theories to provide fair notice).

Conversion is "the unlawful exercise of dominion and control over personal property belonging to another in exclusion or defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made." *Muncey v. Eyeglass World, LLC*, 289 P.3d 1255, 1261 (N.M. App. 2012) (internal quotations omitted). A contributing joint account holder may maintain a conversion action against a noncontributing joint account holder. *Shourek v. Stirling*, 621 N.E.2d 1107, 1109-1110 (Ind. 1993); *Grodzicki v. Grodzicki*, 154 Conn. 456 (1967).

Here, the key issue is whether Defendant's spending from the Joint Account was known to and authorized by Debtor. Based on the trial evidence, the Court is persuaded that Debtor was generally aware of, and did not object to, Defendant's Joint Account expenditures. Often Debtor participated in the trips, casino outings, restaurant meals, and the like that she claimed at trial to have been unaware of. Debtor also was generous in her spending on gifts to and parties for Defendant. The Court further finds that the

---

[20] The Pre-Trial Order superseded the pleadings, so it is the document the Court must examine to determine whether the Trustee sufficiently plead a conversion claim.

-15-

extensive co-mingling of Debtor's and Defendant's funds, the substantial deposit of Defendant's income and student loan proceeds, and the substantial payments of Debtor's expenses from the Joint Account, all are inconsistent with the alleged conversion. Based on the trial evidence, the Court concludes that the Trustee did not carry his burden of proving that Defendant converted any or all of the Deposited Funds.

    D.    <u>The Trustee's Turnover Claim</u>.

The Trustee seeks turnover of more than $90,000 from Defendant pursuant to 11 U.S.C. § 542.[21] In support of his turnover claim, the Trustee alleges: (1) Defendant agreed to pay Debtor's second mortgage payment until the April Transfer had been repaid; and (2) Defendant spent the Deposited Funds without Debtor's authorization. Pre-Trial Order, ¶ 2(a).

    1.    <u>The Section 542(a) claim</u>.

Section 542(a) requires anyone in possession, custody, or control of property of the estate to deliver it to the trustee. *In re Foster*, 188 F.3d 1259, 1265 (10th Cir. 1999) (citing 11 U.S.C. § 542(a)). "The primary condition of turnover relief [under § 542(a)] is possession of existing chattels or their proceeds capable of being surrendered by the

---

[21] The Trustee did not specify whether he was proceeding under §542(a) or (b), so both the Court will analyze both. Section 542 provides in relevant part:
    (a) [A]n entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.
    …
    (b) [A]n entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

-16-

person ordered to do so." *In re Graves,* 609 F.3d 1153, 1157 (10th Cir. 2010) (internal quotations omitted).

The Trustee's allegation that Defendant spent the Deposited Funds without Debtor's authorization apparently is intended to support a § 542(a) claim. The claim fails, because the law is clear that turnover cannot be used to determine the disputed rights of parties. *See In re Charter Co.,* 913 F.2d 1575, 1579 (11th Cir. 1990) (Congress envisioned the turnover section to apply to money due to the debtor without dispute).[22] Instead, turnover is "intended as [a] remedy to obtain what is acknowledged to be property of the bankruptcy estate." *In re Century City Doctors Hosp., LLC,* 466 B.R. 1, 19 (Bankr. C.D. Cal. 2012). *See also In re Rood,* 448 B.R. 149, 161, n. 6 (D. Md. 2011) (noting that turnover is a remedy rather than an independent cause of action). Because the propriety of Defendant's use of the Deposited Funds clearly is disputed, a turnover claim with respect to those funds is not appropriate.

The Trustee's § 542(a) claim would also be defective if the Trustee intended to seek turnover of alleged fraudulent transfers. While a party may use § 542(a) to compel turnover of estate property whose transfer has been avoided, *see, e.g., In re Student Finance Corp.,* 335 B.R. 539, 554 (D. Del. 2005), the Trustee cannot use § 542(a) in lieu of a fraudulent transfer action. *See In re Vaughan Co., Realtors*, 477 B.R. 206, 213, n. 2 (Bankr. D.N.M. 2012) ("A trustee may not use the turnover provisions of 11 U.S.C. § 542 to recover a fraudulent transfer because the fraudulently transferred property does not

---

[22] *See also In re Coudert Bros.,* 2011 WL 7678683, *4 (S.D.N.Y. 2011) (§ 542(b) applies only to undisputed, liquidated claims); *Trefny v. Bear Stearns Securities Corp*., 243 B.R. 300, 320 (S.D. Tex. 1999) (same); *In re Lexington Healthcare Group, Inc.,* 363 B.R. 713 (Bankr. D. Del. 2007) (where there is a legitimate dispute about the ownership of property a trustee seeks to recover, turnover is not appropriate).

become property of the bankruptcy estate until the transfer is avoided and recovered.").[23] Because the transfers here have not been avoided, the Trustee's § 542(a) turnover action is not well taken.

    2.    <u>The Section 542(b) Claim</u>.

Section 542(b) provides that any entity owing a matured debt to the estate must pay it to the trustee. *See In re G.S. Omni Corp.,* 835 F.2d 1317, 1318 (10th Cir. 1987) (citing 11 U.S.C. § 542(b)). The Trustee's allegation that Defendant agreed to pay Debtor's second mortgage falls within the scope § 542(b), i.e. a claim to recover an alleged debt owed by Defendant to the estate. The claim is without merit, however, because both Debtor and Defendant testified that Defendant was never asked to, and never agreed to, repay any of the April Transfer (or any other transferred funds). Defendant therefore does not owe a matured debt to Debtor, and any § 542(b) claim fails.

### III. CONCLUSION

The Court finds that the April and August transfers at issue are not recoverable from Defendant by the Trustee under any theory plead or argued at trial. An appropriate judgment will be entered.

---

[23] *See also Liquidating Trustee of the Amcast Unsecured Creditor Liquidating Trust v. Baker (In re Amcast Indus. Corp.),* 365 B.R. 91, 122 (Bankr. S.D. Ohio 2007) (an action for turnover under § 542 "may be used to compel turnover of estate property whose transfer from the estate has been avoided and ownership is no longer in dispute[,]" but, in order to "state a claim for turnover, the plaintiff must allege that the transfer of funds has already been avoided or that the property is otherwise the undisputed property of the estate.") (citations omitted); *Savage & Assocs., P.C. v. BLR Services SAS (In re Teligent, Inc.)*, 307 B.R. 744, 751 (Bankr. S.D.N.Y. 2004) (because fraudulently transferred property does not become property of the estate until the property has been recovered, "[t]he trustee cannot compel the turnover of non-estate property under 11 U.S.C. § 542, and circumvent the more restrictive fraudulent transfer claim in the process.").

Case 10-01186-t    Doc 69    Filed 01/10/13    Entered 01/10/13 14:39:22 Page 18 of 19

_____
Hon. David T. Thuma,
United States Bankruptcy Judge

Entered on the docket: January 10, 2012.

Copies to:

Bonnie B. Gandarilla
P.O. Box 7459
Albuquerque, NM 87194

Brandon Hertzler
P.O. Box 3006
Albuquerque, NM 87190